**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 09-38-JJF |
| | : | |
| JAMES FREEMAN, | : | |
| | : | |
| Defendant. | : | |

---

David L. Hall, Esquire, Assistant United States Attorney, and
Robert F. Kravetz, Esquire, Assistant United States Attorney, of
the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorneys for Plaintiff.

Dennis J. Cogan, Esquire, Philadelphia, Pennsylvania.

Attorney for Defendant.

---

**MEMORANDUM OPINION**

October $\partial$ , 2009
Wilmington, Delaware

Farnan, District Judge.

Presently before the Court is Defendant James Freeman's Motion to Suppress Evidence And Request For An Evidentiary Hearing. (D.I. 20.) An evidentiary hearing on this Motion was held on September 21, 2009. For the reasons discussed, Defendant's Motion will be granted in part and denied in part. Specifically, the Motion will be granted to the extent that post-arrest statements made by Defendant to Drug Enforcement Agency agents will be suppressed. The Motion will be denied to the extent that the Court will allow evidence obtained from two warranted searches to be admitted.

## I. BACKGROUND

On March 31, 2009, Defendant James Freeman ("Defendant") was indicted on two counts: 1) knowing and intentional possession with intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii); and 2) knowing and intentional possession with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). (D.I. 1.) A Superseding Indictment was filed on October 15, 2009. (D.I. 29.) On July 6, 2009, Defendant filed the instant Motion seeking the suppression of evidence obtained from two warranted searches and statements made by Defendant to Drug Enforcement Agency ("DEA") agents after his arrest. (D.I.

1

20.) The Court conducted an evidentiary hearing on September 21, 2009.

By his Motion, Defendant raises two separate arguments: 1) that the search warrants issued for the UPS package and for the residence at 9 Berks Court, New Castle, Delaware were not supported by probable cause, and therefore, the fruits of those searches must be excluded; and 2) that Defendant's post-arrest statements to DEA agents were made after he invoked his Miranda right to remain silent, and therefore, must be excluded for having been taken in violation of the Fifth Amendment. (D.I. 22.) With regard to the search warrant for the package, Defendant contends that "the canine alerts that were described in the affidavit submitted in support of the warrant. .. . were patently insufficient to establish probable cause" because no information about the certification, training, or reliability of the dogs was provided. (Id. at 9.) Without the canine alerts, Defendant contends that the other factual averments in the warrant are insufficient to provide a substantial basis for a probable cause determination. (Id. at 10).

Defendant contends that the second search warrant for 9 Berks Court lacked probable cause for the same reasons as the first warrant, but also because the affidavit failed to provide a sufficient nexus connecting the residence to the illegal activities attributed to Defendant. (Id. at 12-13). Defendant

further contends the second warrant was prompted by evidence discovered from the tainted first warrant, and therefore, evidence obtained from the second warrant should be excluded as well. (Id. at 13-14). With regard to the post-arrest statements, Defendant contends the second attempt of the agents to interview Defendant came too soon after his first refusal to speak, and therefore, his Miranda right to remain silent was not "scrupulously honored." (Id. at 15-16).

## II. FINDINGS OF FACT

1. On March 27, 2009, the Honorable Mary Johnston of the Delaware Superior Court issued a search warrant for "[a] 41in. X 19in. plywood box with metal beading weighing 220 pounds" shipped via UPS Freight from Tucson, Arizona to New Castle, Delaware in Defendant's name. (D.I. 22, Ex. A; Ex. A Probable Cause Affidavit, at ¶5.)[1]

2. The investigation of Defendant's activities began on March 23, 2009, when Special Agent Brian Eiseman ("Agent Eiseman") of the DEA spoke with DEA Task Force Officer Ferdinand M. Tolentino ("TFO Tolentino"), who is based in Tucson, Arizona. (Id. at ¶3.) TFO Tolentino informed Agent Eiseman that he had "received information from a past proven and

---

[1]At the evidentiary hearing, the Court heard testimony on the issue of the post-arrest statements. The probable cause issue is to be determined only on the basis of what is contained in the four corners of the two search warrants. (D.I. 28 ("Tr.") at 3, 49.)

reliable confidential source that a subject was shipping a large quantity of drugs to New Castle, DE." (Id.) TFO Tolentino later advised Agent Eiseman that, based on this information, a drug detection canine inspected the package, giving a positive indication of the presence of a controlled substance. (Id. at ¶4.)

3. TFO Tolentino obtained the package's tracking information, and informed Agent Eiseman that the delivery address was 9 Berks Court in New Castle, Delaware. (Id. at ¶4.)

4. On March 24, 2009, TFO Tolentino informed Agent Eiseman that a male who identified himself as James Freeman dropped off the package at a UPS dock. (Id. at ¶5.) Defendant showed a Pennsylvania driver's license with a Philadelphia address, and drove a white mini-van registered to a Phoenix, Arizona rental car company. (Id.) He shipped the package cash-on-delivery. (Id.)

5. Later that day, Agent Eiseman received an email from a UPS Freight Field Security Investigator who advised of several indicators of possible contraband: "[t]he described contents (new table) and packaging do not match, the package is a home made crate, the shipper supplied out of state identification but Freeman advised that he was moving from Tucson to the east coast, Freeman advised that he had no problem with the freight collection charge ($643), the

4

package was a dock drop off, the consignee is the same as the shipper, [and] shipper was driving a rental car." (Id. at ¶6).

6. On March 26, 2009, after agents intercepted the package, Wilmington Police Drug Detection Canine "Gocha" inspected the package and gave a positive indication of the presence of a controlled substance. (Id. at ¶9.)

7. After further investigation of Defendant, Agent Eiseman discovered that Defendant had been arrested by DEA agents in California on March 31, 2008 for Possession of Narcotics Proceeds in excess of $25,000. (Id. at ¶7.) During the arrest, $34,585 was seized by the DEA, but Defendant was released and no charges were filed. (Id.)

8. On March 30, 2009, Judge Johnston issued a second search warrant for 9 Berks Court, New Castle, Delaware. (D.I. 22, Ex. B)

9. The probable cause affidavit for the second search warrant repeated the factual averments from the first affidavit, and additionally averred that: a New Castle County Parcel search indicated that Gwendolyn F. Freeman and Eric Stames were listed as the owners of the home at 9 Berks Court; a DELJIS Criminal History check on Defendant indicated that he held a suspended Delaware driver's license listing 9 Berks Court as his address; a check of law enforcement databases indicated

that Ms. Freeman was a possible relative of Defendant; Ms. Freeman's previous address was the same as the address on Defendant's Pennsylvania driver's license; and that the search of the UPS package uncovered a table with a hidden compartment containing 45.4 pounds of marijuana. (<u>Id.</u> at ¶¶ 3-15.)

10. On March 30, 2009, Defendant was arrested by a team of DEA agents, including Special Agent Steven Murphy ("Agent Murphy"). (D.I. 28 ("Tr.") at 11.)

11. After Defendant was transported to the DEA Resident Office in Wilmington, he was placed in a holding cell without handcuffs. (Tr. at 13.) A short time later, at approximately 2:33 P.M., Agent Murphy, along with Agent Eiseman and Task Force Officer Mitchell Rentz ("TFO Rentz"), removed Defendant from the holding cell and brought him to an interview room. (Tr. at 14.) Agent Murphy informed Defendant of his <u>Miranda</u> rights by reading verbatim from DEA Form 13, Advice of Rights, and allowing Defendant to read the form. (<u>Id.</u>) When Agent Murphy asked Defendant if he understood his rights, Defendant responded in the affirmative. (Tr. at 16.) Defendant did not request an attorney. (Tr. at 17.) When asked if he was willing to answer some questions, Defendant responded, "No." (<u>Id.</u>) Agent Murphy wrote "refused" on the signature line to

6

indicate that Defendant refused to sign the form (Tr. at 17, 54), and ended the interview at approximately 2:45 P.M. (Tr. at 17.) Defendant was returned to the holding cell. (Tr. at 18.)

12. At approximately 3:10 P.M., Agent Murphy and Agent Eiseman removed Defendant from the holding cell for routine processing, including the taking of fingerprint samples and photographs. (Tr. at 19.) While fingerprinting Defendant, Agent Murphy "spontaneously" asked Defendant if he would be interested in answering some questions. (Id.) Defendant responded in the affirmative. (Tr. at 20.) Agent Murphy finished fingerprinting Defendant, and he and Agent Eiseman returned to the interview room with Defendant. (Id.) Agent Eiseman did not threaten Defendant, or make any promises to induce him to talk. (Id.) Defendant was "calm" and "cooperative." (Tr. at 21.)

13. Once Defendant was seated in the interview room, Agent Murphy reminded him that his Miranda rights were still in effect. (Tr. at 21.) Agent Murphy asked Defendant if he understood, and he responded in the affirmative. (Id.) However, Defendant was not re-read his Miranda rights verbatim. (Tr. at 38.)

14. Defendant told the agents he traveled from Philadelphia to Tucson to play basketball and meet some girls. (Tr. at 23.)

7

He stated that he bought a table for $1400 while in Arizona because someone in Philadelphia was willing to purchase it for $2800. (Tr. at 24.) He denied any knowledge of any contraband contained inside the table. (Id.) Further, Defendant informed the agents that 9 Berks Court was the home of his mother, stepfather, and grandmother, and that he had keys to the residence. (Tr. at 24- 25.) He admitted that a fish tank stand and table found in the home's garage belonged to him. (Tr. at 25.)

15. When Defendant requested legal representation, Agent Murphy terminated the interview and returned Defendant to the holding cell. (Id.)

## III. CONCLUSIONS OF LAW

### A. The March 27, 2009 Search Warrant For Package Shipped Via UPS

16. The Fourth Amendment to the United States Constitution protects "the right of the people to be secure against unreasonable searches and seizures. . . ." U.S. Const, amend IV.

17. Probable cause for a search warrant exists if, based on the totality of the circumstances in the warrant affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238-239 (U.S. 1983) (citations omitted).

18. When an issued search warrant is later challenged on the basis of probable cause, the Court must determine not whether probable cause actually existed, but whether the issuing judicial officer had a substantial basis for finding probable cause. U.S. v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (citations omitted). In conducting this review, the Court must afford great deference to the issuing judicial officer's determination. Gates, 462 U.S. at 236.

19. Further, the Court should take a common-sense approach to reviewing the affidavit and avoid interpreting it in a hyper-technical manner. U.S. v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993). Facts in the record which were not before the issuing judicial officer should not be considered, and marginal cases should be resolved in favor of upholding the warrant. Id. at 1055, 1058.

20. A positive alert by a drug detection canine alone can support probable cause for the issuance of a search warrant. See e.g., U.S. v. Fisher, 2002 WL 563581 at *7 (E.D. Pa. 2002) (a "positive alert by a sufficiently trained and reliable drug-sniffing dog, on its own, constitute probable cause for issuance of a search warrant.")

21. The Court concludes that the warrant affidavit in this case is not invalid for failing to contain the certification, training or reliability of the Tucson canine or the

9

Wilmington Police canine 'Gocha'. Defendant contends that the case of U.S. v. Kennedy, 131 F.3d 1371 (10th Cir. 1997), requires all warrant affidavits concerning drug detection canines to contain a statement as to certification, training, and reliability. (See D.I. 25, at 3 ("the defense cited [Kennedy] to show that its extremely modest drafting requirements should be familiar to any reasonably well-trained federal narcotics officer"); id. at 4 ("a short and simple statement that the dog is 'certified, trained, and reliable' will . . . ensure that a judicial officer has good reason to permit a cadre of federal law enforcement officers to breach the door of a man's home").) However, in the Court's view, Kennedy does not stand for a per se requirement that certification information covering the dog must be included in a warrant affidavit. See Kennedy, 131 F.3d at 1378-79 (holding that an affidavit was sufficient to support probable cause in spite of undisclosed issues with the canine's training and certification, in part because the affidavit contained other facts.) Additionally, the Third Circuit has not decided whether facts identifying the canine certification and reliability of the drug detection canine used must be included in a search warrant affidavit, and the Court declines to do so in this case.

22. With regard to the instant affidavit, the Court finds that

the canines' positive alert, together with the other factual averments in the affidavit, provided a substantial basis for Judge Johnston's probable cause determination.

23. Specifically, the Court finds that although the drug canines' qualifications were not referenced, there were positive alerts from two canines on two separate occasions. (D.I. 22, Ex. A Probable Cause Affidavit, at ¶¶4, 9.) Further, a UPS Field Investigator identified conduct of the Defendant and circumstances in Arizona which supported a reasonable belief that Defendant was engaged in criminal conduct. Namely, the description of the crate's contents did not match its packaging, the crate was homemade, the consignee was the same as the shipper, and Defendant drove a rental car. (Id. at ¶6.) Further, Defendant had been arrested during the previous year for possession of narcotics proceeds in excess of $25,000. (Id. at ¶7.) In sum, the Court finds these facts provide a substantial basis for a determination of probable cause.

## B. The March 30, 2009 Search Warrant For the Freeman Home

24. In order for a search warrant for a residence to be supported by probable cause, the warrant affidavit must have asserted "a sufficient nexus between the contraband to be seized and the place to be searched." U.S. v. Loy, 191 F.3d 360, 365 (3d Cir. 1999).

11

25.   Direct evidence of a link between a residence and contraband
      need not be present, but rather, "probable cause can be, and
      often is, inferred by 'considering the type of crime, the
      nature of the items sought, the suspect's opportunity for
      concealment and normal inferences about where a criminal
      might hide' the fruits of his crime."   Hodge, 241 F.3d at
      305 (citing Jones, 994 F.2d at 1056).

26.   In light of the facts averred in the instant warrant
      affidavit, the Court concludes there was a substantial basis
      to support Judge Johnston's determination that probable
      cause existed to search 9 Berks Court.[2]  Evidence of
      involvement in the drug trade is likely to be found in a
      drug dealer's residence.   U.S. v. Whitner, 219 F.3d 289, 297

      ─────────────────────

      [2] Alternatively, the Court concludes that even if a
      substantial basis for a determination of probable cause was
      lacking, the evidence obtained from the search of 9 Berks Court
      is admissible under an exception to the exclusionary rule.
      Evidence obtained during a search later invalidated by a court is
      suppressed "only if the officers were dishonest or reckless in
      preparing their affidavit or could not have harbored an
      objectively reasonable belief in the existence of probable
      cause."  U.S. v. Leon, 468 U.S. 897, 926 (1984).   Defendant
      contends no officer could have harbored a reasonable belief that
      the warrant was based on probable cause, but the Court concludes
      there were sufficient averments in the affidavit as to
      Defendant's activities and previous criminal history, as well as
      to the contraband contained in the package and his relationship
      to the residence to support a determination of probable cause.
      See Leon, 468 U.S. at 923 (an officer cannot claim good faith
      reliance on a warrant if the affidavit is "so lacking in indicia
      of probable cause as to render official belief in its existence
      entirely unreasonable")(citing Brown v. Illinois, 422 U.S. 590,
      610-11 (1975)).

(3d Cir. 2000). The inference that evidence of drug involvement is likely to be found in a drug dealer's residence is based on three preliminary premises: "1) that the person suspected of drug dealing is actually a drug dealer; 2) that the place to be searched is possessed by, or the domicile of, the dealer; and 3) that the home contains contraband linking it to the dealer's drug activities." U.S. v. Burton, 288 F.3d 91, 104 (3d Cir. 2002). Although 9 Berks Court appears to be the residence of Defendant's relatives rather than his own residence, similar considerations apply here. The UPS package shipped by Defendant to himself contained over 45 pounds of marijuana. Given this quantity of narcotics, it was reasonable to infer that Defendant was not merely a user. See Burton, 288 F.3d at 104. Defendant apparently resided at a Philadelphia address, but held a suspended Delaware driver's license listing the 9 Berks Court address. Also, the owner of the residence, Ms. Freeman, had a previous address matching Defendant's Philadelphia address. When considered together, the Court concludes it was reasonable to infer that Defendant was closely connected to the residence and its inhabitants, even if not actually domiciled there. Finally, Defendant shipped the package to himself at the 9 Berks Court address, indicating some connection between the

13

residence and drug dealing activities.

27. Further, the Court concludes that other factual averments in the affidavit, including the suspiciousness of Defendant's activities in Tucson and his earlier arrest, support a determination that probable cause existed to search the home. See Burton, 288 F.3d at 103 ("probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband" at a residence).

## C. Defendant's Post-Arrest Statements to DEA Agents

28. The Government may not use statements in its case-in-chief obtained as a result of custodial interrogation by law enforcement officers, unless the defendant has been advised of, and validly waived, his rights: (1) to remain silent, and that any statements can be used as evidence against him; and (2) to the presence of retained or appointed counsel during questioning. Miranda v. Arizona, 384 U.S. 436, 444 (1966) (hereinafter "Miranda warnings").

29. Once Miranda warnings have been given, "if a suspect indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. Id. at 473-74.

30. When a person in custody indicates a desire to remain silent, there is "no per se proscription of indefinite

14

duration upon further questioning by any police officer on
any subject." Michigan v. Mosley, 423 U.S. 96, 102-03
(1975). Rather, "the admissibility of statements obtained
after the person in custody has decided to remain silent
depends under Miranda on whether his 'right to cut off
questioning' was 'scrupulously honored'". Id. at 104.

31. Based on the testimony adduced at the September evidentiary
hearing, the Court concludes that Defendant's Miranda rights
were not "scrupulously honored," and accordingly, all
statements he made to DEA agents after his arrest must be
suppressed. Mosley identified four factors useful for
determining whether Miranda rights were "scrupulously
honored": 1) waiting a significant amount of time after the
defendant cut off questioning to resume interrogation; 2)
giving the defendant a fresh set of Miranda warnings; 3)
that the defendant had invoked his right in regards to an
offense other than the one subsequently being questioned;
and 4) that the officers conducting the subsequent
interrogation were different from the original officers whom
defendant had declined to speak to. U.S. v. Lafferty, 503
F.3d 293, 303 (3d Cir. 2007). The Court finds that none of
these factors are present in this case. (See Tr. At 17-18,
38, 23, 43-44.)

32. Several Third Circuit cases have found that a defendant's

15

<u>Miranda</u> rights were not scrupulously honored when a
defendant's statements were induced by coercive
interrogation tactics. <u>See</u> <u>Lafferty</u>, 503 F.3d at 302
(concluding that defendant's right to remain silent was not
scrupulously honored when she was placed in the same
interrogation room as her co-conspirator boyfriend because
she was likely forced to react to his statements or to
assent by silence); <u>U.S. v. Tyler</u>, 164 F.3d 150, 155 (3d
Cir. 1998)(concluding that defendant's right to remain
silent was not scrupulously honored when he was interrogated
in a room with pictures of the murder victim's body hanging
on the walls and instructed to "tell the truth"). Agent
Murphy did not threaten or induce Defendant's statements
(Tr. at 20), but the Court nevertheless concludes that
Defendant's <u>Miranda</u> rights were not scrupulously honored.
When asked initially whether he was willing to answer
questions, Defendant unequivocally answered "no." (Tr. at
17.) The fact that Agent Murphy wrote "refused" on DEA Form
13 to indicate Defendant refused to sign the form, not that
Defendant refused to speak without a lawyer present (Tr. at
54), is not significant in view of Defendant's clear "no."
Less than 30 minutes after Defendant refused to answer any
questions, agents initiated an attempt to question
Defendant. (Tr. at 35.) Although Agent Murphy's second

16

request to Defendant was characterized as "spontaneous" and not premeditated (Tr. at 36), the Court finds that Defendant's clear "no" was ignored. Defendant was advised that his <u>Miranda</u> rights still applied, but the <u>Miranda</u> warnings were not repeated. (Tr. at 38.) Given Defendant's initial refusal to answer questions, the closeness in time (approximately one-half hour) with which the second attempt to question followed that refusal, and the failure to again properly advise Defendant concerning his <u>Miranda</u> rights, the Court concludes that Defendant's <u>Miranda</u> rights were not "scrupulously honored," and any statements made by Defendant must be suppressed.

17